Opinion
 

 NEAL, J.—
 

 Summary
 

 This case concerns whether a dependent infant should be returned to the custody of his criminally insane parents, one of whom killed a prior child. Without receiving or weighing expert evidence, and based solely on a caseworker’s summary description of experts’ opinions, the trial court ordered that the parents have unmonitored visits with the child. This order was not supported by a preponderance of evidence, and accordingly was erroneous.
 

 Facts and Procedural History
 

 The dependent child, Victor, was bom in December 1996 to Rosa A., his mother, and Juan S., his father.
 

 In February 1997 the department of children and family services petitioned the trial court under the Welfare and Institutions Code for an order “detaining” Victor, that is, temporarily removing him from his parents’ custody. The petition alleged in summary that in 1985 Juan stabbed a woman with a knife in a hospital emergency room during an acute psychotic episode; Juan was prosecuted, but found not guilty by reason of insanity; in 1986 Rosa stabbed a daughter to death; Rosa was prosecuted but found not guilty by reason of insanity; both Rosa and Juan were sent to Patton State Hospital, a psychiatric hospital for the criminally insane, and released therefrom only under a supervised community release program; neither parent has been legally restored to sanity.
 

 The facts alleged in the petition are not disputed.
 

 On March 21, 1997, the court sustained the petition, ordered Victor detained, and placed him in shelter care pending further order.
 

 Over several days in July 1997 the court conducted the jurisdictional hearing under Welfare and Institutions Code section 300. At the conclusion
 
 *1302
 
 of these hearings,
 
 [1]
 
 on July 22, 1997, the court declared Victor a dependent of the court, took custody away from his parents, and ordered the department to commence efforts for suitable placement. The court found by clear and convincing evidence that leaving Victor with his parents would pose a substantial danger to his physical and mental health. The court set a further hearing for September 22, 1997, ordered the department to prepare a progress report for that hearing, and authorized
 
 monitored
 
 parental visits with Victor. Finally, the court ordered the department to provide “reunification services.”
 

 “Reunification services” are offered to assist the parents of a detained child to qualify for the child’s eventual return. Welfare and Institutions Code section 361.5, subdivision (c) prohibits reunification services to parents who have caused the death of a child unless clear and convincing evidence shows that reunification is in the child’s best interest.
 

 In this case the department apparently offered no expert testimony opposing reunification services, and did not appeal from the order requiring such services.
 

 On September 22, 1997, the parents filed petitions under Welfare and Institutions Code section 388 to modify the July 22 “jurisdictional” order, to permit a “60 day visit.” A “60 day visit” is a temporary return of a child to parental custody, as a “trial run” for permanently returning the child to its parents. The “60 day visit” is not specifically established or authorized in the Welfare and Institutions Code, or related court rules, but apparently is instead a local practice followed in Los Angeles County.
 

 On October 29, 1997, the court held a hearing on the petitions for a “60 day visit.” At the hearing the court heard testimony from only two witnesses: the department’s caseworker Mr. Larreynaga, and Victor’s father Juan. Larreynaga was called as an adverse witness by the parents.
 

 Larreynaga testified that the department opposed a 60-day visit between Victor and his parents, based on their violent history, and the fact that they remained under a judicial declaration of insanity. Testimony also was elicited from Larreynaga that he was “unaware of any professional who has had contact with the parents who is recommending that it would be unsafe to return the child to their care.”
 

 
 *1303
 
 Juan testified briefly, identifying hallucinatory episodes he had suffered in 1992 and 1995.
 

 No expert testimony was presented at the hearing. Rosa’s counsel sought to cross-examine Larreynaga concerning a report dated June 9, 1997, by psychologist Dr. Alfred Crespo, previously prepared for the court under Evidence Code section 730. The trial court declined to allow this, stating “I don’t think it’s going to benefit anything.” When Rosa’s counsel next offered to call Rosa’s therapist, the court stated “Do we really need to call all these experts?” Department’s counsel objected to admission of the report by Rosa’s therapist without a chance to cross-examine her. The court ultimately declined to receive
 
 any
 
 expert reports in evidence,
 
 [2]
 
 and declined to hear expert testimony (“I don’t see the necessity of bringing in a stream of experts to testify to what Mr. Larreynaga has already testified to.”).
 

 Excerpts from Dr. Crespo’s report illustrate that, contrary to Larreynaga’s testimony, the “professionals” were
 
 not
 
 unanimous in concluding that the parents posed no danger to Victor. Although Dr. Crespo recommended returning Victor to his parents, his report noted: “The opposite opinion has been expressed by Dr. Vollmer, a psychiatrist whose report on her review of records indicated that she has been ‘doing [Evid. Code sec.] 730 evaluations of mentally ill mothers for six years.’ Dr. Vollmer stated that based on her view of the records she was ‘Extremely concerned’ about the danger posed by both parents to their child. Dr. Vollmer wrote in her report that the mother ‘lacks insight into her illness’ and as a consequence may be ‘Totally unpredictable.’ Dr. Vollmer further stated that the father is incapable of assuming custody of this infant’ since his history of acting violently ‘could reoccur when the child cries because he is hungry or tired.” (Emphasis in original.)
 

 Dr. Crespo further reported: “[Juan] stated that presently he is still on psychotropic medication because ‘I get depressed still.’ He stated that he knows that he has ‘something chronic’ which his medication helps him to control. He stated that he knows he is prone to feel ‘sad’ and to lose his appetite and motivation. When asked if he has any negative feelings about being on medication, he stated ‘to be frank’ he did not like to be medicated previously.”
 

 
 *1304
 
 Crespo’s report further noted that “the presence of a small child can create stresses that vulnerably [sic] mentally ill parents are unable to cope with.”
 

 Another report in the file is by Nancy Kaser-Boyd, a psychologist who administered psychological tests to the parents. Boyd commented:
 

 “Neither parent currently has psychological test materials which suggest mental disorder or risk to an infant. Psychological tests should be regarded as a measure of current functioning, not potential for the future ....
 

 “Regarding the risk to the minor if one parent decompensates:[
 
 3
 
 ] It is obvious that there would be risk to a child with a psychotic parent. There is greater risk to the minor if Mother decompensates because she is the parent most likely to provide a safe environment for the minor . . . .” (Emphasis in original.)
 

 At the conclusion of the October 29 hearing, the court modified the July 22 order to allow the parents unmonitored overnight visits, apparently in the expectation of eventually granting the “60 day visit.”
 

 At the department’s request, the court stayed the order until November 5, 1997. The department then filed the present petition for a writ challenging that portion of the October 29, 1997, order permitting unmonitored visits. We issued a stay and order to show cause.
 

 Discussion
 

 The record before the trial court failed to support its conclusion that unmonitored visits were safe for Victor.
 

 Parents seeking to change an order making their child a dependent must prove that new evidence or changed circumstances warrant the change sought, and that the change is in the best interest of the child. (Welf. & Inst. Code, § 388.) They must so demonstrate by a preponderance of the evidence. (Evid. Code, § 115;
 
 In re Fred J.
 
 (1979) 89 Cal.App.3d 168, 174-175 [152 Cal.Rptr. 327].)
 

 Welfare and Institutions Code section 362.1 authorizes orders for parental visitation with minors, but subdivision (a) specifies that “[n]o visitation order shall jeopardize the safety of the minor.”
 

 
 *1305
 
 At the earlier, jurisdictional hearing the court concluded that clear and convincing evidence
 
 [4]
 
 demonstrated Victor’s continued residence with his parents to be substantially dangerous, and warranted allowance only of monitored visits. At the modification hearing it was the parents’ burden to show that new evidence or changed circumstances justified departing from the court’s earlier conclusion, and that unmonitored, overnight visits were in Victor’s best interest, and posed no threat to his safety.
 

 The principal “new evidence” offered at the modification hearing was Larreynaga’s summary testimony that he was “not aware of any professional who opposed” returning Victor to his parents. The trial court specifically declined to hear expert testimony or consider expert reports.
 

 Larreynaga’s testimony was not sufficiently substantial to establish, by a preponderance of evidence, that the requested modification was justified. The testimony was inadmissible hearsay. It was a one-sentence summary of extensive psychological and psychiatric reports, on a complex and difficult question, by a witness who was neither a psychologist nor psychiatrist. Further, the testimony was demonstrably inaccurate, since Dr. Crespo’s report specifically discussed at least one psychiatrist, Dr. Vollmer, who had extensive experience with mentally ill mothers, and who strongly opined that the parents posed a danger to Victor. In short, Larreynaga’s testimony had little if any probative value.
 

 The question at issue was potentially one of life and death for Victor. An infant may be stabbed to death in a matter of seconds, in the middle of the night. Further, the question whether a psychotic killer is permanently cured is a difficult one, fraught with uncertainty, even for the smartest and most experienced experts. The Legislature has specifically recognized the serious dangers posed by parents with a history of homicide, authorizing reunification services only where clear and convincing evidence shows the child’s best interest is served. (Welf. & Inst. Code, § 361.5, subd. (c).)
 

 It was imperative for the trial court to carefully consider and weigh all available expert psychiatric and psychological evidence before reaching its decision. The best means for doing this is a full-blown hearing, with opposing expert viewpoints presented through live testimony, and subjected to vigorous cross-examination.
 

 We recognize that crowded juvenile court dockets make it impractical to routinely conduct plenary testimonial hearings, and that California Rules of
 
 *1306
 
 Court, rule 1432(f) authorizes modification decisions based on declarations. But the difficulty of the issue presented in this case, and its life-and-death implications, suggest that live presentation of the opposing expert viewpoints, with full, searching cross-examination, was highly desirable if not absolutely required. At a minimum, full, careful examination and weighing of all available expert reports was required.
 

 Disposition
 

 Let a writ of mandate issue directing the trial court to vacate its order permitting unmonitored visits, and to hold a new modification hearing, with updated expert opinions or reports, at which the propriety of unmonitored visits is determined only after a thorough presentation and consideration of substantial, competent evidence.
 

 Johnson, Acting P. J., and Woods, J., concurred.
 

 [1]
 

 The minute orders do not indicate that any expert testimony was received in these hearings. The July 18 minute order notes that “all exhibits marked are received” but does not further identify these exhibits.
 

 [2]
 

 Several reports are in the appellate record, including some tendered by the parents with their opposition to the writ proceeding. However, it is absolutely clear from the hearing transcript that the court neither received nor considered these materials in reaching its decision to modify visitation rights.
 

 [3]
 

 “Decompensate” is psychologists’ jargon for a psychotic episode.
 

 [4]
 

 “Clear and convincing evidence” is “evidence of such convincing force that it demonstrates, in contrast to the opposing evidence, a high probability of the truth of the fact[s] for which it is offered as proof.” (BAJI No. 2.62.)